[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 15-10939
Non-Argument Calendar

_____

D.C. Docket No. 6:14-cv-00213-GKS-TBS


RICHARD WILLIAM DUVAL,

Plaintiff-Appellant,

versus

COMMISSIONER OF SOCIAL SECURITY,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(December 29, 2015)

Before MARTIN, JILL PRYOR and ANDERSON, Circuit Judges.

PER CURIAM:

Richard William Duval appeals from the district court's decision to affirm

the Commissioner of Social Security's denial of his applications for disability

insurance benefits and supplemental security income.  On appeal, Mr. Duval argues that the administrative law judge ("ALJ") erred in three ways.  First, he contends that the ALJ failed to apply the proper standards when reviewing medical opinions from treating and non-treating physicians to determine his residual functional capacity and that substantial evidence does not support the ALJ's evaluation of those opinions.  Second, he argues that the ALJ failed to apply proper standards to assess his credibility, and substantial evidence does not support the ALJ's conclusion that his testimony was only partially credible.  Third, he claims that the ALJ failed to account for his mental limitations when formulating a hypothetical question for the vocational expert. After careful consideration, we affirm the district court's judgment in favor of the Commissioner.

## I.   Background

Mr. Duval applied for disability insurance benefits and supplemental security income with the Social Security Administration.  After the Commissioner denied his applications and reconsideration of his applications, Mr. Duval requested and received a hearing before an ALJ.

### A.

Before the ALJ, Mr. Duval claimed that he was no longer able to work in his previous jobs or any other jobs because of seizures, headaches, wrist pain, anxiety, and depression.  First, Mr. Duval testified about the severity and frequency of his

2

seizures.  He explained that he experienced his first seizure in March 2010 and that his seizures generally lasted two to four minutes.  During the seizures, he would convulse, bite his tongue, and drop to the floor.   According to Mr. Duval, after a seizure it takes him approximately 20 minutes to regain full consciousness, and then he is exhausted for several hours.  He testified that when he first began experiencing seizures, he would have two or more seizures per month and that in the two months leading up to the hearing (March and April 2012), he had four seizures.  He offered no testimony about the frequency of his seizures in the period between these two times.

Mr. Duval presented evidence from Dr. Ahmed Sadek, a neurologist, and HenChai Lai, a nurse practitioner who worked with Dr. Sadek.  They treated Mr. Duval for his seizures and saw him once every two to three months.  In September 2011, Dr. Sadek completed a Seizure Impairment Questionnaire explaining that Mr. Duval suffered from average of one to two seizures per month and that his seizures were moderately controlled but that his prognosis was unpredictable.  In March 2012, Dr. Sadek and Ms. Lai signed a letter reporting that Mr. Duval continued to experience one to two seizures a month and that medication failed to control adequately his seizures.  But treatment records from Dr. Sadek and Ms. Lai reflect that Mr. Duval at times throughout 2010 reported having no seizures between appointments or having less than one seizure per month and that

3

medication was controlling his seizures. Moreover, treatment notes from an April 2012 appointment show Mr. Duval reported experiencing no seizures in over a month.

Second, Mr. Duval testified about his headaches. He described experiencing approximately one to two migraine headaches a month and that when he had a migraine, he needed to stay in a dark room for several hours. Dr. Sadek also treated Mr. Duval for his headaches, and Mr. Duval again relied on opinions from Dr. Sadek before the ALJ. In April 2012, Dr. Sadek completed a Headache Questionnaire in which he stated that Mr. Duval had experienced three to four migraine headaches a month and four to five tension headaches a week. Dr. Sadek explained that medication was unable to completely relieve the pain without unacceptable side effects and that Mr. Duval's pain and other symptoms frequently interfered with his attention and concentration. Dr. Sadek further opined that because of his headaches and other impairments, Mr. Duval was incapable of performing low stress work, was precluded from performing even basic work activities, and would be absent from work at least three times a month. Dr. Sadek expected these symptoms to continue for at least 12 months.

But Dr. Sadek's treatment records tell a different story about the headaches. Treatment records from an appointment just three weeks before Dr. Sadek completed the Headache Questionnaire show that Mr. Duval experienced only two

4

headaches in a month and a half and that he had elected not to take his headache medications because the headaches were not severe enough.  The treatment notes also indicate that Mr. Duval's tension headaches had resolved.

Third, Mr. Duval testified about injuries to his wrist.  In April 2005, Mr. Duval fractured his right wrist while working.  He had three surgeries on his wrist with the last one in 2007 or 2008.  He testified that he never regained full function after the surgeries and continued to have problems with his wrist.  He explained that he had difficulty holding objects in his right hand and limited movement in his right wrist, along with a weak grip.  In February 2012, Ms. Lai completed a Bilateral Manual Dexterity Impairment Questionnaire, indicating that Mr. Duval had reduced grip strength and tenderness in his right hand.  She opined that he could never lift or carry any weight and was essentially precluded from grasping, turning, or twisting objects, as well as from using his hands or fingers for fine manipulations.  But treatment notes from Dr. Sadek and Ms. Lai show that Mr. Duval repeatedly reported normal ranges of motion and strength with no tenderness in his right upper extremity, which would include his wrist.

Fourth, Mr. Duval testified about his depression and anxiety.  Mr. Duval explained that he had experienced relatively constant depression for the past two years, which limited his ability to focus and concentrate, but he failed to identify any specific instance when the depression limited him physically.  He also testified

that he suffered from anxiety attacks every other day that lasted approximately ten minutes. He stated that he could sit for only 30 minutes before he began to feel anxious. He could stand or walk for about 45 minutes before needing to sit down, and he would need a ten minute break before he could resume walking. He also reported experiencing panic attacks but failed to identify any triggers for his panic attacks.

Mr. Duval submitted medical records showing that Naomi Kitner, a licensed mental health counselor, diagnosed him in March 2012 with mixed anxiety and depression. After consulting with Ms. Kitner and a psychiatrist, Mr. Duval began to take medication for his depression and anxiety, which he reported improved and stabilized his mood.

Mr. Duval described to the ALJ how his seizures, headaches, wrist pain, depression, and anxiety limited him on a day-to-day basis. He stated that because of his seizures, he had stopped driving and had his license revoked. He lived in a two-story townhome but stayed on one level of the house to avoid using the stairs because his seizures occurred without warning. He testified that he was not self-sufficient and relied on his family for assistance. He admitted that he could dress and bathe himself and perform housework like vacuuming and laundry, although the tasks took him longer than normal. He reported seeing friends at his home about once a month and occasionally leaving his home with family members. He

6

testified that he engaged in hobbies at home, like working with model cars, but reported very limited use of his right arm.

Besides Mr. Duval's testimony and treatment records from Dr. Sadek, Ms. Lai, and Ms. Kitner, the ALJ also reviewed a consultative examination report from William W. Austin, Psy.D.  After examining Mr. Duval in January 2011, Dr. Austin diagnosed him with generalized anxiety disorder and major depressive disorder and concluded that Mr. Duval had compromised social functioning and moderately impaired functional abilities.

The ALJ also considered reports from medical providers who reviewed Mr. Duval's treatment records but never treated or examined him.  Dr. John Rinde, an internist, completed a physical residual functional capacity assessment in April 2011 and determined that Mr. Duval's seizure disorder was fairly well controlled and that he faced no limitations other than to avoid work on ladders, ropes, or scaffolds or with machinery.   Deborah Carter, Ph.D., reviewed Mr. Duval's treatment records, including Dr. Austin's consultative examination, to determine the limitations that Mr. Duval faced based on his mental health condition.  She concluded that he was moderately limited in his abilities to carry out detailed instructions, to maintain attention and concentration for extended periods of time, to complete a normal workday and workweek without interruptions from his

7

psychologically based symptoms, and to interact appropriately with the general public.

The ALJ heard expert testimony from a vocational expert ("VE"). The ALJ asked the VE the following hypothetical question:

> [L]et's assume a hypothetical person of the claimant's age, education and work experience who is able to lift up to 20 pounds occasionally and lift and carry up to ten pounds frequently. This person would be able to stand and walk for about six hours in an eight hour workday and would be able to sit for up to six hours in an eight hour workday. This person should never climb ladders or scaffolds. This person should avoid exposure to operational control of moving machinery and unprotected heights and also to hazardous machinery. This person's work would be limited to simple, routine and repetitive tasks. Simple means learned with an on the job demonstration or within 30 days. Routine means performed the same way or in a similar manner each time. And repetitive means performed from start to finish over and over throughout a workday . . . Could this individual perform any other job in the national or regional economy?

Hearing Tr. (Doc. 14-4 at 110–11).[1] The VE answered that this individual could work as a street cleaner, electronics worker, ticket taker, or produce weigher. The ALJ then added the limitation that the person could have only occasional interaction with coworkers and the public. The VE testified that this person could still perform the electronic worker and street cleaner positions.

At the close of the hearing, the ALJ left open the record so that Mr. Duval could submit additional evidence including medical records regarding his treatment for bipolar disorder. Instead of treatment notes, Mr. Duval provided a Psychiatric

---

[1] Citations to "Doc." refer to docket entries in the district court record in this case.

8

Impairment Questionnaire completed by Dr. Ramon Martinez, a psychiatrist who treated him. Dr. Martinez diagnosed Mr. Duval with bipolar disorder and indicated that he had marked limitations in areas related to understanding and memory, sustained concentration and persistence, social interactions, and adaptation. Based on these limitations, Dr. Martinez opined that Mr. Duval was incapable of even low stress work.

## B.

The ALJ issued a written decision concluding that Mr. Duval was not disabled within the meaning of the Social Security Act. The ALJ used the regulations' five-step, sequential evaluation process to determine whether Mr. Duval was disabled. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). First, the ALJ concluded that Mr. Duval had not engaged in substantial gainful activity since March 1, 2010. Second, the ALJ found that Mr. Duval suffered from the following severe impairments: epilepsy seizure disorder, distal radioulnar joint arthrosis right wrist, and depression. Third, the ALJ determined that Mr. Duval did not have an impairment or combination of impairments that met or medically equaled the severity of an impairment listed in 20 C.F.R. Part 404, subpart P, appendix 1.

Fourth, the ALJ concluded that Mr. Duval could not perform his past relevant work. In reaching this conclusion, the ALJ considered Mr. Duval's residual functional capacity and concluded that he could perform work at the light

exertional level.  The ALJ found that Mr. Duval could lift, carry, push, or pull up to twenty pounds occasionally and ten pounds frequently and that he could stand and walk for approximately six hours and sit for approximately six hours in an eight-hour workday.  The ALJ recognized that Mr. Duval should never climb ladders or scaffolds and should avoid exposure to operational control of moving machinery, unprotected heights, or hazardous machinery.  The ALJ determined that Mr. Duval's work needed to be limited to simple, routine, and repetitive tasks with only occasional interaction with coworkers and the public.  The ALJ rejected Mr. Duval's statements about the intensity, persistence, and limiting effects of his symptoms to the extent they were inconsistent with the ALJ's residual functional capacity assessment and unsupported by objective medical evidence.  Based on this residual function capacity, the ALJ concluded that Mr. Duval was unable to perform his past work but could perform a significant number of jobs in the national economy, such as street cleaner or electronics assembler.  Accordingly, the ALJ concluded that Mr. Duval was not disabled.

Mr. Duval sought review of the ALJ's decision by the Appeals Council and submitted additional evidence to the Appeals Council.  The Appeals Council considered some new mental health records that Mr. Duval submitted but refused to review most of his new evidence, concluding that it concerned a later time

period.  Because the Appeals Council determined there was no reason to review the ALJ's decision, it denied his request for review.

### C.

Mr. Duval then filed an action in district court seeking review of the ALJ's decision denying benefits.[2]  A magistrate judge entered a report and recommendation concluding that the Commissioner's decision should be reversed and remanded for further proceedings because the ALJ failed to analyze Mr. Duval's credibility properly.  Although no objection was filed, the district court entered a one-page order rejecting the magistrate judge's report and recommendation.  The district court affirmed the Commissioner's final decision based on its summary conclusions that "substantial evidence supports the [ALJ]'s findings concerning the work that Duval . . . is able to perform" and "the [ALJ] applied the proper legal analysis."  Order (Doc. 19).  This appeal followed.

## II.  Standard of Review

In Social Security appeals, we review *de novo* the legal principles upon which the Commissioner's decision is based.  *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005).  We may not decide facts anew, make credibility decisions, or reweigh the evidence.  *Id.*  Instead, we review the Commissioner's decision "only to determine whether it is supported by substantial evidence."  *Id.*

---

[2] Mr. Duval did not challenge the Appeals Council's refusal to consider some of the additional materials that he submitted to it.

"Substantial evidence is more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938); *see also Richardson v. Perales*, 402 U.S. 389, 401 (1971) (applying substantial evidence standard to disability determinations under the Social Security Act).  When a decision is supported by substantial evidence, we must affirm, "[e]ven if we find that the evidence preponderates against the [Commisioner's] decision."  *MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir. 1986).  Similarly, we review an ALJ's credibility determination concerning a claimant's complaints of pain and other subjective symptoms for substantial evidence supporting the determination. *Marbury v. Sullivan*, 957 F.2d 837, 839 (11th Cir. 1992).

### III.  The ALJ's Treatment of Testimony from Medical Providers

The social security regulations establish a five-step evaluation process to evaluate disability claims.[3]  20 C.F.R. §§ 404.1520, 416.920.  Mr. Duval's appeal

---

[3] At step one, the ALJ determines whether the claimant is engaged in "substantial gainful activity."  20 C.F.R. § 404.1520(a)(4).  If not, then the claimant must show at step two that his impairment is "severe," meaning it "significantly limits [his] physical or mental ability to do basic work activities."  *Id.* § 404.1520(a)(4), (c).  If the claimant makes that showing, then at step three he must show that he has an impairment that meets or equals the criteria contained in the listings of impairments.  *Id.* § 404.1520(a)(4).  If the claimant shows his impairment meets or equals a listing, then he is determined to be disabled.  *Id.*  If he fails to do so, then at step four, the ALJ considers the claimant's residual functional capacity to determine whether the claimant could still perform his past relevant work activity.  *Id.*  If the claimant could not do so, then the ALJ moves to step five and determines whether, in light of the claimant's residual functional capacity, age, education, and work experience, he could perform other work.  If so, the claimant is not disabled; if not, the claimant is disabled.  *Id.*; s*ee also id.* § 416.920(a)(4).

focuses on step five in the evaluation process, whether he can perform other work. He argues that in evaluating his residual functional capacity, the ALJ erred by rejecting the opinions of his treating medical providers and relying on the opinions of medical providers who never treated or examined him.  We disagree.  Because substantial evidence supported the ALJ's conclusion that there was good cause for failing to give substantial or considerable weight to the opinions of Mr. Duval's treating providers, there is no error here.

## A.

An ALJ must give the medical opinions of a treating physician, such as Dr. Sadek, "substantial or considerable weight unless good cause is shown to the contrary."  *Phillips v. Barnhart*, 357 F.3d 1232, 1240 (11th Cir. 2004) (internal quotation marks omitted); *see* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).  Good cause exists when: (1) the opinion "was not bolstered by the evidence," (2) the "evidence supported a contrary finding," or (3) the "treating physician's opinion was conclusory or inconsistent with the doctor's own medical records."  *Phillips*, 357 F.3d at 1240–41.  We require an ALJ to articulate clearly the reasons for giving less weight to the opinion of a treating physician.  *Id.* at 1241.  When substantial evidence supports the ALJ's articulated reasons for assigning limited weight to a treating physician's opinion, there is no reversible error.  *See Moore*, 405 F.3d at 1212.

13

Here, the ALJ applied the correct standard in declining to give substantial or considerable weight to the opinions of Dr. Sadek, Ms. Lai, and Dr. Martinez because their opinions were unsupported by progress notes or conclusory.  For the reasons discussed below, we further conclude that substantial evidence supports the ALJ's finding of good cause.

1.

Substantial evidence supports the ALJ's conclusion that Dr. Sadek's opinions were unsupported by his treatment notes.  Although Dr. Sadek opined that Mr. Duval experienced one to two seizures per month and that mediation failed to adequately control his seizures, his treatment notes reflect that at times Mr. Duval's seizures occurred less frequently and were controlled by medication.[4]  In fact, the ALJ cited to specific treatment notes showing Mr. Duval reported no seizures between appointments or seizures that occurred less frequently than once per month and that medication was controlling the seizures.  Given these records, substantial evidence supports the ALJ's conclusion that treatment records do not support Dr. Sadek's opinions about Mr. Duval's seizures.

Substantial evidence also supports the ALJ's conclusion that Dr. Sadek's opinions about the severity and frequency of Mr. Duval's headaches were not

_____

[4] Mr. Duval attempts to rewrite Dr. Sadek's opinions when he argues that the medical records "confirm Mr. Duval was often having 1 to 2 seizures a month."  Appellant's Br. at 37. But he overlooks that in a March 2012 letter Dr. Sadek stated that Mr. Duval experienced one to two seizures per month, an opinion unsupported by Dr. Sadek's treatment notes.

14

credible.  In April 2012, Dr. Sadek completed a Headache Questionnaire indicating that Mr. Duval experienced four to five tension headaches a week and three to four migraines a month and that medication only moderately controlled the headaches. But treatment records show that Mr. Duval's headaches occurred less frequently and were less severe than Dr. Sadek noted.  Indeed, the treatment notes from Mr. Duval's last appointment before the questionnaire show that he reported only two migraines in a month and a half, which were manageable; his tension headaches had resolved; and he had stopped taking his headache medication.[5]  Because substantial evidence supports the ALJ's determination that Dr. Sadek's opinions were inconsistent with his treatment records, the ALJ had good cause to afford Dr. Sadek's opinions less weight.[6]

---

[5] The ALJ concluded that progress notes throughout the record failed to support Dr. Sadek's opinions about the severity of Mr. Duval's headaches.  Mr. Duval argues that we can consider only the evidence cited by the ALJ, meaning that we cannot look to the April 2012 treatment notes.  We disagree because "there is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision." *Dyer v. Barnhart*, 395 F.3d 1206, 1211 (11th Cir. 2005).

[6] Mr. Duval also argues that the ALJ erred by giving little credit to the opinions of Ms. Lai.  Even assuming the ALJ was required to consider Ms. Lai's opinions, substantial evidence supports the ALJ's conclusion that treatment records fail to support her opinions for the same reasons discussed above for Dr. Sadek's opinions.  We recognize that Ms. Lai offered an additional opinion about the severity of Mr. Duval's wrist injury.  But Mr. Duval has failed to raise a challenge to the ALJ's determination about the extent of his wrist limitations, meaning he has abandoned this argument.  *See Access Now, Inc. v. Sw. Airlines Co.*, 385 F.3d 1324, 1330 (11th Cir. 2004) (deeming abandoned an argument the appellant failed to raise in its initial brief).

2.

Mr. Duval also argues that the ALJ erred in summarily rejecting the opinions of Dr. Martinez, the psychiatrist who treated Mr. Duval.  Although Dr. Martinez opined that Mr. Duval had marked limitations in almost all areas of mental activity, we conclude that substantial evidence supports the ALJ's conclusion that these opinions are unsupported by Dr. Martinez's progress notes.

Dr. Martinez treated Mr. Duval for a short period of time—only one month—and saw Mr. Duval twice before opining about his mental impairments. Dr. Martinez's notes from Mr. Duval's first visit reflect that he had a cooperative attitude, intact impulse control, a clear and coherent thought process, age appropriate cognition, and intact insight and judgment.  Given these progress notes from one of the two treatment sessions, substantial evidence supports the ALJ's conclusion that the progress notes did not support Dr. Martinez's opinions. Accordingly, the ALJ did not err in giving Dr. Martinez's opinions less than considerable or substantial weight.

B.

Mr. Duval also argues that the ALJ erred in relying on opinions from non-treating, non-examining medical providers that he had only minor limitations based on his seizure disorder and psychological conditions.  His argument rests on the premise that it is error for an ALJ to credit opinions from a non-treating, non-

16

examining medical provider "when contradicted by the opinions from a treating specialist whose opinions are consistent with the underlying record."  Appellant's Br. at 31.  Even assuming Mr. Duval has correctly stated the law, the principle is inapplicable here because substantial evidence supports the ALJ's conclusion that treatment records failed to support the treating medical providers' opinions.  In other words, there was no error in the weight the ALJ gave to opinions of the non-treating, non-examining medical providers.

### IV.  The ALJ's Treatment of Mr. Duval's Testimony

Mr. Duval also challenges the ALJ's determination that his testimony about the intensity, persistence and limiting effects of his symptoms was not credible to the extent that it was inconsistent with the ALJ's residual functional capacity assessment and unsupported by medical evidence.  He argues that the ALJ failed to apply the proper standard and that substantial evidence does not support the credibility determination.  We are unconvinced.

When a claimant attempts to establish a disability through his own testimony concerning pain or other subjective symptoms, we require "(1) evidence of an underlying medical condition; and (2) either (a) objective medical evidence confirming the severity of the alleged pain, or (b) that the objectively determined medical condition can reasonably be expected to give rise to the claimed pain." *Wilson v. Barnhart*, 284 F.3d 1219, 1225 (11th Cir. 2002).  If the record shows that

the claimant has a medically determinable impairment that could reasonably be expected to produce his symptoms, the ALJ must evaluate the intensity and persistence of the symptoms in determining how they limit the claimant's capacity for work. 20 C.F.R. §§ 404.1529(c)(1), 416.927(c)(1). The ALJ is not required to examine every piece of evidence so long as the decision does not broadly reject the claimant's case and is sufficient for a reviewing court to conclude that the ALJ considered the claimant's medical condition as a whole. *See Mitchell v. Comm'r, Soc. Sec. Admin.*, 771 F.3d 780, 782 (11th Cir. 2014). "If proof of disability is based upon subjective evidence and a credibility determination is, therefore, critical to the decision, the ALJ must either explicitly discredit such testimony or the implication must be so clear as to amount to a specific credibility finding." *Foote v. Chater*, 67 F.3d 1553, 1562 (11th Cir. 1995) (internal quotation marks omitted).

The ALJ applied the correct legal standard when reviewing Mr. Duval's credibility, and substantial evidence supports the ALJ's credibility determination. The ALJ applied the three-step framework for evaluating subjective testimony from a claimant. In evaluating the intensity and persistence of symptoms, the ALJ concluded there were inconsistencies between Mr. Duval's testimony and the objective medical evidence. For example, after finding that the medical records

contradicted Mr. Duval's assertion that he had very limited use of his right hand, the ALJ discounted his testimony.

Mr. Duval claims that the ALJ failed to provide any reason for finding his subjective testimony about seizures,[7] headaches, and mental impairments to lack credibility. We disagree. The ALJ explained that Mr. Duval's testimony was not credible to the extent it was unsupported by the objective medical evidence and then discussed at length why similar opinions from Mr. Duval's treating medical providers were unsupported by the record. From this discussion, we can clearly infer what testimony from Mr. Duval the ALJ found lacking in credibility and why it was discredited. For example, the ALJ discussed the medical evidence showing that Mr. Duval's seizures were controlled by medication, the severity of his headaches was overstated, and he had only mild to moderate limitations based on his depression and anxiety.

Mr. Duval also argues that the ALJ used improper boilerplate language that tied the credibility determination to the ALJ's residual functional capacity assessment. But we have previously affirmed credibility determinations using that formula when they did not broadly reject the claimant's testimony. *See Mitchell*, 771 F.3d at 781–82. We conclude that the ALJ committed no legal error when

---

[7] We note that Mr. Duval presented limited testimony about the frequency of his seizures and testified only about the frequency in March 2010, March 2012, and April 2012. It appears that Mr. Duval made a strategic decision not to testify about the frequency of his seizures in the intervening period when they occurred less frequently.

19

reviewing Mr. Duval's testimony, and substantial evidence supports the ALJ's determination that Mr. Duval's testimony was only partially credible.

## V.    The ALJ's Treatment of the VE's Testimony

As explained above, the ALJ used the five-step sequential evaluation to determine whether Mr. Duval was disabled. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4) . Mr. Duval contends that the Commissioner failed to carry his burden at step five to show that significant numbers of jobs exist in the national economy that he can perform based on his residual functional capacity, age, education, and work experience. The Commissioner may demonstrate that a claimant is capable of performing other work through the testimony of a VE. *See Wilson*, 284 F.3d at 1227 (referring to VE testimony as the preferred independent evidence of jobs that are available in the national economy). A VE's testimony constitutes substantial evidence if the ALJ poses a hypothetical question that includes all of a claimant's impairments. *Id.* Although the ALJ is required to include each of the claimant's impairments in the hypothetical question, there is no requirement that the question include alleged symptoms without support in the medical record or that are alleviated by medication. *Ingram v. Comm'r of Social Sec. Admin.*, 496 F.3d 1253, 1270 (11th Cir. 2007).

An ALJ must account for a claimant's limitations in concentration, persistence, or pace in a hypothetical question to the VE. *Winschel v. Comm'r of*

20

*Soc. Sec.*, 631 F.3d 1176, 1180 (11th Cir. 2011).  An ALJ may account for these limitations by limiting the hypothetical to unskilled work "when medical evidence demonstrates that a claimant can engage in simple, routine tasks or unskilled work despite limitations in concentration, persistence, and pace."  *Id.*  In *Winschel*, we concluded that the ALJ needed to include the claimant's limitations in concentration, persistence, or pace in the hypothetical question to the VE because there was no indication from the medical evidence that the claimant could perform work despite his limitations.  *Id.* at 1181.

The ALJ posed a proper hypothetical question that included all of Mr. Duval's impairments.  As discussed above, the ALJ's credibility determinations that influenced the hypothetical question posed to the VE were supported by substantial evidence.  Furthermore, the ALJ accounted for Mr. Duval's moderate limitations in concentration, persistence, or pace by limiting him to simple, routine, and repetitive tasks, which medical evidence showed he could perform.  Since the hypothetical question was proper, and the VE informed the ALJ that Mr. Duval could perform other jobs in the national economy that exist in significant numbers, the Commissioner met her burden to show that Mr. Duval was capable of performing other work.

## VI.  Conclusion

For the reasons set forth above, the district court's judgment is affirmed.

**AFFIRMED.**